## JACKSON v. CORPORATION COMMISSION.

### (Filed June 19, 1902.)

TAXATION—*Railroads—Franchise—Acts 1901, Chap. 7, secs. 42, 43, 48, 50.*

> Under Acts 1901, Chap. 7, the North Carolina Corporation Commission is not required to assess for taxation the intangible property of railroads, to-wit, the franchises, separately from the assessment of the tangible property before the year 1903.

CLARK and DOUGLAS, J.J., dissenting.

ACTION by W. J. Jackson against the North Carolina Corporation Commission, heard by Judge *W. S. O'B. Robinson,* at September Term, 1901, of the Superior Court of WAKE County. From a judgment for the defendant, the plaintiff appealed.

A full statement of the facts may be found in the dissenting opinion of Judge DOUGLAS, which appears to have been originally written as the opinion of the Court.

*H. S. Ward,* for the plaintiff.

*Robert D. Gilmer, Attorney-General,* and *Burwell, Walker & Cansler,* for the defendant.

MONTGOMERY, J.    The question for decision in this case is this: Was it the duty of the defendants to assess for taxation, in the year 1901, the franchises of the railroad companies in this State separately from the assessment of their tangible property? The failure of the defendants to make

such separate assessments (admitted in their answer) is the matter complained of by the plaintiff, and as a support for the correctness of the view expressed above as to what the question for decision is, allegation three of the complaint is inserted: "That the defendants, as members of the said North Carolina Corporation Commission, have failed and refused to assess for taxation and determine the value of the intangible property of the railroad companies in this State. to-wit, the franchises separately from the assessment of the tangible property, as they are directed to do by Sections 43 and 50 of Chapter 7, Public Laws 1901, and have failed and refused to attempt to make such valuation and assessment, and have failed and refused to determine, or attempt to determine, the market value of the capital stock, certificates of indebtedness, bonds and other securities of said companies in their assessment of the properties of said companies."

The defendants, in their answer, do not admit that the pertinent sections of the Machinery Act of 1901 require them to make assessments and franchises of railroad companies separately in any year before or after 1903, and in the brief of their counsel it is argued at length that the writ of mandamus should not be granted because the alleged duties, the performance of which was sought to be enforced against the defendants, were discretionary in their character and required the exercise of judgment on their part. There is no room for such an argument here. No discretion is given the defendant by the General Assembly in Sections 43, 48 and 50, Chap. 7, of the Machinery Act of 1901, as to the manner and method of assessing the physical property and the franchise valuation of railroad companies.

The rules by which they are to be guided in making these assessments are clearly prescribed, their judgment and discretion being allowed only in one instance, viz: When they are to consider of the actual cost to replace the property with

a just allowance for depreciation on rolling stock, and also of other conditions to be considered, as in the case of private property, when they come to value the physical or tangible properties of the companies.   All else is mandatory.

The Machinery Act of 1899 gave to the defendants discretion in the matter of assessing the taxes on the property of the railroad by authorizing them, in making their assessment, to consider the value of the franchise, without formulating any rules by which that valuation and assessment should be discovered.   But the Legislature of 1901 put an end to that discretion, and laid down special and particular rules by which the real property shall be valued and the franchise shall be estimated, and required separated assessments. There can be no doubt about the power of the State to have levied a franchise tax on corporations.   Const., Art. V, Sec. 3.   And there can be no doubt that the franchise tax may be assessed separately from the tangible property assessment.

. As we have seen, the State has done those things in the Machinery Act of 1901, and the question arises, When did, or do, these assessments go into effect?   That is the only uncertainty about the matter in dispute, and the answer to the question, of course, depends upon whether Section 50 of the Machinery Act was in force in June, 1891, or whether its operation was postponed by clear implication, deduced from the language of Section 48 of that act.   Without doubt, the assessment or valuation for taxation upon the tangible property and that upon the franchise, is to be made at the same time.   The language of the statute, as to the time, being: "The said Commissioners shall first determine the value of the tangible property,   *   *   *   and they shall then assess the value of the franchise, which shall be determined by due consideration of the gross earnings as compared with the operating expenses, and particularly by consideration of the value placed upon the whole property by the public, the value

of the physical property being deducted as evidenced by the market value of all capital stock, * * * and the aggregate value of the physical or tangible property and the franchise as thus determined shall be the true value of the property for the purpose of an *ad valorem* taxation, and shall be apportioned," etc.

By our laws for generations, there have been stated periods and times at which, under oath, owners of property were required to list, as it is commonly called, or return a schedule of their property, real and personal, for assessment for taxation by officers appointed for that purpose. All real estate, except that belonging to railroad companies, up to 1899, was assessed quadrennially (railroad property, real and personal, having been listed annually), and all personal property was listed and assessed in June, annually. By Section 12 of Chapter 7, Machinery Act, Acts 1901, the next assessment of real estate is to take place in June, 1903, and by Section 48 of the same chapter, the real estate, rolling stock and such personal property of railroad companies, necessary for the construction, repairs or successful operation of such railroad lines, is to be listed or returned for taxation and assessment at the same time that other real estate is to be returned for assessment and taxation. Section 50 of the Machinery Act furnishes the manner and method of determining the value of the tangible property of railroad companies, and also of the franchises. The aggregate value of both, determined according to the prescribed method and manner, constitutes the true value of the entire property for the *purpose of an ad valorem taxation*. Now, can an *ad valorem* taxation be fixed upon the entire property of a railroad company, under Section 50, except at the time fixed by law for the return of the real and personal property of the company for taxation and its assessment by the defendant Commissioners? The answer seems to be found in the opening sentence of Section 42 of the same

act: "Upon the meeting of the Corporation Commission for the purpose of assessing railroads and other property, they shall thereupon value and assess the property of each association, company, co-partnership and corporation in the manner herein set forth, after examining such statements (statements made under Section 40 of the same act), and after ascertaining the value of such properties thereupon, and upon such other information as they may have or obtain." As we have seen, the real and personal estates of railroad companies is to be returned, under oath, for assessment and taxation to the Commission at such dates as real estate is required to be returned and assessed for taxation, and there is to be no further assessment of real estate until June, 1903. Then, if any assessment of the tangible property of the railroad companies should be made by the Commission except at the time when by law that property is to be returned and assessed for taxation, would such assessment be legal? It would seem not. If, then, there can be no valid assessment of the tangible property of railroad corporations until 1903, how can a franchise tax be arrived at under Section 50? They stand or fall together. Without a knowledge of what the assessment of the tangible property amounts to, you could not discover what the franchise tax would be; for the franchise tax is "the market value of all the capital stock, certificates of indebtedness, bonds and other securities, due consideration being given to the gross earnings as compared with the operating expenses," *less the physical or tangible property.*

The contention of the plaintiff that under Section 49 of the same act, the assessments made by the defendants of the real estate of the railroad companies in 1900 remains the assessment until June, 1903, and should be taken by the defendants as a valuation of the tangible property in determining the value of the franchise under Section 50, can not be maintained, for the simple reason that that assessment was made

on the real and personal property, and included in its value the value of the franchise, and was therefore a different assessment from the one ordered to be made on the tangible or physical property in Section 50, by the rule of determining its value by a consideration of the actual cost to replace the property, with a just allowance for depreciation on rolling stock, etc. Nor can an assessment be made by the Commission upon the information contained in Section 49, and that which that section authorizes the Commission to secure, for the reason that such an assessment would be at a time different from the time fixed for the assessment of the property, of the tangible property, of railroads under Section 48 of the same act.

If it should be objected to this opinion that, to be consistent, it embraces impliedly the view that there is no statute which fixes the assessment of the real and personal property of the railroad companies in this State, upon which taxes can be levied and collected, until the assessment provided for in June, 1903, by the act of 1901, Chapter 7, Section 12, it would have to be admitted that that is a fact. The act of 1899, Chap. 15, Sec. 43, required railroad companies to report, under oath, for assessment and taxation their real and personal property annually—on the 1st day of June of each year; and in 1900, the railroad companies made such returns of their property, thereby complying with the law then in force in that respect. The act of 1901 repealed Section 43 of Chapter 15 of the Laws of 1899, and required quadrennial assessments thereafter, to begin on June 1, 1903, and did not continue the assessment of 1900 or that of 1899, or fixed any other to be the basis of taxation on railroad property until the assessment of 1903. This view does not conflict with the rule that the Revenue Laws of the State are to be considered as a series of laws, and to be construed together as a whole, when necessary to find out the meanings of doubtful provisions in the one last enacted. Section 12, Chapter 7, Acts

1901, provide *quadrennial* assessments of railroad property, to begin June 1, 1903; while Section 43, Chapter 15, Acts 1899, provides for *annual* assessments to be made on the 1st day of June of each year. These two sections are palpably contradictory of each other, and so inconsistent that the last enacted repeals that of 1899. But that is none of our responsibility. It may have been a part of that compromise and settlement with the railroad companies of the State mentioned in the message of the Governor, and which message was filed by the defendants with their answer; but the General Assembly, in the act of 1901, as we have seen, did not incorporate it in that act. We have no evidence, as we have said before, that the assessment of 1899 or 1900, or any other, was adopted as the assessment that should prevail until 1903.

We have not invoked the aid of the Governor's message in coming to a conclusion in this case. The acts of Assembly which we have been considering were free from doubt, except as to the time when the franchise tax should be assessed separately from the tax on property; and it certainly would be a dangerous expedient for this Court to adopt as a rule of interpretation of a statute the consideration of a communication to the Legislature on the subject-matter of the statute.

It may not be that legislative bodies always carry out, or ought to carry out, the suggestions and recommendations addressed to them in messages by the Chief Executives of States.

We see no error in the action of the Judge in dismissing the case.

No Error.

FURCHES, C. J., concurring. Plaintiff alleges that he is a citizen of the State, a tax-payer, and is Sheriff of his county, and as such Sheriff is interested in his commissions; that defendants are members of the North Carolina Corporation

Commission, whose duty it is to assess the property of the railroads of the State for taxation; that defendants have failed, neglected and refused to assess said railroads according to "Sections *43 and 50, Chap. 7, Public Laws of 1901*"; that he is reliably informed and believes, and avers, that said defendants are in possession of reliable information to the effect that the value of the property of said railroads in this State is as much as *$150,000,000;* that it is found by defendants that the tangible or physical property of said companies is about $42,000,000, and that the value of the *franchises* is approximately *$108,000,000,* which it is the duty of the defendants to assess for taxation, in addition to their assessment of the tangible or physical property of said railroads. And plaintiff therefore asks for a writ of mandamus compelling defendants to assess said franchises.

The defendants answered and admitted that they are the members of the Corporation Commission, and that it is their duty to assess the property of said railroads for taxation, which they allege they have done according to law as they understand it. And defendants say they have assessed the entire property of said railroads, *including the franchises,* but say they did not assess the franchises separately from the other property of said companies, as they were advised and believed that it was not their duty to so assess said franchises; and they deny the fourth paragraph of the complaint, in which it is alleged that *the franchises* of said railroads are approximately *of the value of one hundred and eight millions of dollars.*

While I think the plaintiff's right to bring and maintain this action is too broadly stated in the opinion, I do not expect to put my opinion on that, as that would be putting it upon technical grounds, which I do not wish to do; but I do not think the Illinois case, principally relied upon in the opinion of the Court for that purpose, sustains the right of plaintiff

to bring and maintain this action; that action was brought by the Attorney-General in the name of the State of Illinois, while the plaintiff in this case proceeds alone, upon his own rights, and without the aid of the State. Would it be the plaintiff's right, if he conceived the idea that my property was not assessed, for the purposes of taxation, high enough, to bring mandamus against the Commissioners of Iredell to compel them to reassess and increase its value? If he can do this, every tax-payer in the State may do so, and litigation would be interminable. If this is the law, it seems to me that it would be well to regulate it. But why discuss a matter that I shall not rely upon in my opinion?

I shall endeavor to put my opinion upon the merits of the question presented by the record as to whether *the franchises* of the railroads of the State shall be assessed separately for taxation for 1901 and 1902, or not until 1903. This is the question as I understand it, and not whether they *"can be so taxed."* Nor do I understand the question to be as to whether the railroads "shall pay *any* tax upon their intangible property before the year 1903."

And while this is stated to be the question in the opening sentence of the opinion of the Court, it is stated further on in the opinion that "It should be borne in mind that the sections under consideration do not impose any additional tax upon railroads, as Section 45 of the Machinery Act of 1899 expressly directs that the value of franchises shall be included in the assessment of railroad property." So I do not think the question under consideration is correctly or fairly stated in the opinion of the Court.

The Court, further on in the opinion, speaks of the great importance of this question to railroads on the one side and to the State on the other, and says: "We would have preferred that the parties whose real interest are at stake should have been directly represented in this action; they would have

been heard had they seen fit to become parties hereto." It is true this is an action for mandamus for the purpose of compelling the Corporation Commission to increase the taxes on railroads. This I admit they have the *power* to do, but the railroads have no such power. They can not levy or assess taxes, and it seems to me they would have been improper parties to this action. And it also seems to me that it is sufficiently understood that the interests of the railroads are involved.

It will be seen that the act of 1899 taxed everything that is taxed by the act of 1901, including *franchises.* So it is not a question of omission to tax, and whether the Legislature had the right to do this—that is, omit to tax the franchise— it has not done so; and the question is, was it the duty of the Commissioners, in 1901, to assess the *franchise* separately from the other property of the railroad companies?

The Constitution of the State does not require the *franchise* to be taxed. Article V, Section 3, of the Constitution is as follows: "Laws shall be passed taxing, by uniform rule, all monies, credits, investments in bonds, stocks, joint stock companies or otherwise; and also all real and personal property, according to its true value in money. The General Assembly may also tax trades, professions, *franchises* and incomes, provided that no income shall be taxed when the property from which the income is derived is taxed."

It therefore appears that there is no constitutional provision requiring the Legislature to tax *franchises.* This is admitted in the opinion of the Court. We have seen they were taxed by the act of 1899, but if they had not been, this would have given the plaintiff no right of action.

It is admitted that the Legislature of 1901 did not increase the subjects of taxation; that *franchises* were taxed by the act of 1899; and the only thing contended for by the plaintiff is that the *franchises* are to be assessed *separately* from the

property of the railroads, which, he alleges, has not been done,. and this allegation is admitted by the defendants.    It is true the plaintiff contends that if this had been done, it would have shown these *franchises* to be "worth approximately *one hundred and eight millions of dollars.*"    That is, a property, *including the franchises,* now assessed at *forty-two millions,* would have been increased to more than three times its present assessed value.    The plaintiff offered no evidence to support this contention, and, to my mind, the contention is erroneous, and I can not accept it as true without any evidence to support it.    My own mind rejects this contention, and, besides, I can not accept it without finding that the Railroad Commissioners were either too stupid to discharge their duty, or too corrupt to be worthy to hold their positions; as the plaintiff alleges that the Commissioners had reliable information of facts that would have led to this result.    I do not believe that the Commissioners are either stupid or dishonest.

The act of 1901 was not a new act—not original legislation. It was only amendatory of the act of 1899, and the act of 1901 effected substantially but two changes in the act of 1899 ; and these are the manner of assessing the property for taxation and the *time when this new method of assessment shall go into effect.*    As to the manner of assessing the property under the act of 1901, there is no controversy; the only controversy is as to when this new mode of assessment goes into effect.    Upon examination, it will be seen that Section 48 of the Acts of 1901 is Section 43 of the Acts of 1899, and that Section 50 of the Acts of 1901 is Section 45 of the Acts of 1899, with only one change which is necessary to be stated and considered in order to determine this controversy, as I think.

Section 43 of the Acts of 1899 is as follows: "The president, secretary, superintendent or other principal accounting officer within this State of every telegraph and railroad com-

pany, whether incorporated by any law of this State or not, shall return to the said Commissioners, *for assessment and taxation,* verified by the oath or affirmation of the officer making the return, all the following-described property belonging to such corporation on the first day of *June of each year,* within this State." Then, naming the same property and subjects of taxation that are named in Section 48 of the Acts of 1901.

Section 48 of the Acts of 1901 is as follows: "The president, secretary, superintendent, or other principal accounting officers within this State of every railroad, telegraph, telephone, street railway companies, whether incorporated by the laws of this State or not, *shall, at such dates as real estate is required to be assessed for taxation,* return to said Commissioners, for *assessment and taxation,* verified by the oath or affirmation of the officer making the return, all the following-described property belonging to such corporations within this State"—then describing the articles subject to taxation, being substantially the same as in section 43, act of 1899—changing *June of each year,* in the act of 1899, to such time as real estate shall be required to be listed for taxation in the act of 1901.

By every rule of interpretation known to the law, these two acts, that of 1899 and that of 1901—must be considered together. The language and meaning of the act of 1899 must first be determined and then the language used in the act of 1901; and if the act of 1901 differs from the act of 1899, in what respect, and then determine what is the meaning of the act of 1901. There has been a change in the language of the two acts, which, in my opinion, materially affects and changes their meaning. It would have been folly in the Legislature of 1901 to have changed the language in Section 43 of the Acts of 1899, unless it had intended to change the meaning of Section 43 of the Act of 1899, when the Legislature of 1901 reenacted Section 43, in every other substantial part.

Section 43, Acts of 1899, provides that said property shall be returned "to said Commissioners for *assessment and taxation* * * * on the first day of June of each year."* This is plain, unmistakable language that the assessment and taxation should *be every year.*

Section 48, Acts of 1901, re-enacting Section 43 of act of 1899, in other respects, uses this language, in lieu of the *"first day of June of each year," "shall, at such dates as real estate is required to be assessed for taxation,* return to said Commissioners, *for assessment and taxation,* verified by the oath or affirmation of the officer making the returns, all the following property," etc.

Reading and construing these sections together, it is manifest—indeed, to my mind, "it is perfectly clear," that these franchises were not intended to be, and are not to be, *assessed for taxation until 1903.*

If it was intended they should be assessed *each year,* why was this language, already in Section 43 of the Acts of 1899, changed in the act of 1901 so as to read, "shall be assessed for taxation *at such dates as real estate is required to be assessed for taxation"?*

It will be noted that the language used in Section 43, act 1899, and in 48, act of 1901, is not only that the officers therein named shall make returns of the property therein named, but it shall be made by them *for the purpose of assessment and taxation.* This language is not used in either of the other sections quoted and relied on in the opinion of the Court. In those it is provided that the officers shall make returns.

Section 49 of the act of 1901 is the same in substance, if not in very words, of Section 45 of the act of 1899, including the reference to Section 1959 of The Code. Section 50 only provides for the manner of assessment, and has no reference to the time when the assessment shall be made. As to this,

the time of assessment depends upon Section 48, Acts 1901, construed in the light of Section 43, Acts 1899.

If the language of Section 48, Acts 1901, is to prevail, and the assessment is to take place *when real estate* is required to be assessed for taxation, this assessment will be in 1903, as that will be the time, under former legislation, when such assessments will take place. But if the act of 1901, Chap. 7, Sec. 12, expressly provides that such assessments shall take place in 1903.

It seems to me that by every rule of construction, without any aid outside of the statute, it should be held that there should be no *new* assessment of these *franchises, for the purpose of taxation,* until 1903.

But if the act itself does not plainly show that no new assessment of these franchises is to be made until 1903, it would seem that the act, taken in connection with the Governor's message, puts it beyond all doubt. The Legislature of 1901 was elected at the same time Governor Aycock was elected, and was composed of more than two-thirds of his political friends. This being so, on the first of February he transmitted to the Legislature the special message set out in defendant's answer and quoted in the opinion of the Court.

This message commences as follows: "I transmit herewith the second annual report of the North Carolina Corporation Commission. You will observe from said report that the cases known as the Railroad Taxation Cases, pending in the Circuit Court of the United States for the Eastern District of North Carolina, have been compromised and settled. Under the provisions of law, the Corporation Commission, in 1899, assessed the property of the Atlantic Coast Line at $12,885,775, the Southern Railway at $14,713,850, and the Seaboard Air Line at $7,980,245—making a total assessment of $35,579,870, which was a total increase on the three systems over the assessment of 1898 of $9,022,678. The assess-

ment of the three systems named in 1900 was $36,373,382." The message further states that the railroads were unwilling to pay this increased assessment of $9,022,678, and were resisting its payment in the Federal Courts. But finally they agreed to pay it provided the assessment should not be increased until 1903, and inasmuch as it was costing the State as much as $20,000 a year to carry on this litigation with these railroads, the proposed compromise was accepted by him (the Governor) under the advice of his counsel. He then says that he considers this settlement just, and recommends its ratification by the Legislature, and says: "If such a law shall be passed, the railroads will not be again assessed until 1903." It is contended, in the opinion of the Court, that this message is ambiguous and uncertain as to what it recommends. But whether there is ambiguous language contained in it or not, there is not, and can not be, any ambiguity in the closing sentence in the recommendations (though not in the message), which says if such a law is passed, "the railroads will not again be assessed for taxation until 1903." This message was sent to the Legislature the first of February, and the act under consideration was passed and ratified on the 15th of March following, changing the language from "each year" to such time as "real estate shall be required to be assessed for taxation."

The opinion of the Court does not admit that the message militates against the construction contended for by the plaintiff and adopted by the Court; but, for some reason, the Court undertakes to show that its consideration as a means of interpretation is incompetent and improper. But I propose to show by high authority that its consideration is not only competent, but proper.

It is the spirit and purpose of the act that gives it life, and is to be observed and control in its construction, if this can be ascertained, where there is doubt as to the meaning of

the language used, unless such intention conflicts with provisions and requirements of the Constitution. In such cases, to carry out the supposed or ascertained intent, this intent will have to yield to the higher law, if in conflict with the Constitution, as in *Wilson v. Jordan,* 124 N. C., 685; *Wood v. Bellamy,* 120 N. C., 212. But nothing of that kind appears in this case to interfere with the Court ascertaining the meaning of the act; and nothing could be more pertinent for that purpose than the message of Governor Aycock to the Legislature of 1901, for reasons I have given, and the legislation passed in pursuance thereof, as we must suppose this act was.

It is said by Endlich on the Interpretation of Statutes, Sec. 27, "Lord Coke's Rule": "The literal construction, then, has in general but a *prima facie* preference. To arrive at the real meaning, it is always necessary to take a broad general view of the act, so as to get an exact conception of its aim, scope and object. It is necessary, according to Lord Coke, to consider, first, what was the law before the act was passed; second, what was the mischief or defect for which the law had not provided, and, fourth, the reason of the remedy. According to another authority, the true meaning is to be found not merely in the words of the act, but from the cause and necessity of its being made, from a comparison of its several parts and from extraneous circumstances, or by an examination of and comparison of the doubtful words with the context of the law, considering the reason and spirit and the inducing cause of its enactment. The true meaning of any passage is to be found not merely in the words of that passage, but in comparing it with every other part of the law, ascertaining, also, what were the circumstances with reference to which the words were used, and what was the object appearing from those circumstances which the Legislature had in view, and what were the causes and occasion of the

passage of the act and the purpose intended to be accomplished by it in the light of the circumstances at the time and the necessity of its enactment." And to the same effect are Sections 29 and 30. The same doctrine is laid down in Black on Interpretation of Law, Chap. 7, Secs. 85 and 87, and, in fact, in all the works on this subject that I have been able to examine. But I will not consume the time of the Court by making further quotations. I take it that these authorities have fully sustained me in referring to the message of Governor Aycock, which gives the reason and the object for changing the statute of 1899, which provided for an assessment *for taxation every year,* to a provision for an assessment for the purposes of taxation *when it is required that real estate shall be assessed for the purposes of taxation.*

It is admitted in the opinion of the Court that the Governor and Legislature had the right to compromise with railroads, but it is contended that there was no compromise. The Governor says there was a compromise, and I must believe he knew whether there was a compromise or not, and I do not believe he would have said there was if there had not been. I do not understand the Court to say, or even to intimate, that the Governor would say what was not so if he knew it; but that he does not know a compromise when he sees it; that he only claims that there was something over nine millions a year involved in the controversy which the roads yielded, upon condition that their property (the assessment of which had increased $9,000,000 since 1898) should not be assessed for taxation again until 1903. The Court seems to think this was no compromise, because the plaintiff has alleged that the *franchises* alone are worth approximately *one hundred and eight millions of dollars,* without offering one particle of evidence to support this disputed allegation, and which seems to me to be large enough to fall of its own weight. But if the Governor and the Legislature had the right to enter into

this compromise, and this is admitted in the opinion of the Court, and there was no fraud in it, I do say that I think good faith requires that it should be kept. I do not understand it to be our duty to revise this action of the Governor and Legislature, and whether they made a good compromise or not, is not for this Court to say. It may not have been a good compromise, but if there was no fraud in the transaction, I do not consider that this Court has any right to revise their action.

In the opinion of the Court the question is asked: "Will it be contended that a *franchise is* real estate?" I might ask if it is contended that, *for the purpose of taxation,* a franchise is *personal* property? If it is personal property, it is already taxed, as the Constitution *requires* the Legislature to pass laws taxing all property, personal and real, by a uniform rule, and the Legislature has done this. But it is manifest that a franchise is not considered property for the purposes of taxation in the Constitution. If it had been so considered, it would not have been classed among trades and professions, which the Legislature might or might not tax, at its option. It is thus seen that if the Legislature does tax a franchise, it taxes it as it would a profession or trade, and *not as property.* It is taxed as a lawyer and doctor are taxed, for practicing their professions. There can not be anything, in my opinion, in the argument advanced in the opinion of the Court that another Legislature will assemble before 1903, and the Legislature of 1901 knew they could not pass a law that the next Legislature could not repeal. And that it can not be supposed they would have been guilty of the vain thing of attempting to do so. If they have passed such a law, then it is passed whether it was a vain thing or not. But I maintain that they have not done a vain thing in attempting to forestall the succeeding Legislature. The succeeding Legislature does not assemble until 1903, and the new mode of as-

.sessment goes into effect that year without any further legis-
lation.   It is true the Legislature may repeal this act and
restore the *old mode of assessing franchises and property all
together,* but I do not understand that is what the plaintiff
wants.

It is said in the opinion of the Court that "Great stress
is laid upon the fact that Section 48 of the act of 1901,
which is substantially a re-enactment of Section 43 of the act
of 1899, changes the latter section by omitting the words 'on
the first day of June of each year,' and inserting the words
'at such dates as real estate is required to be assessed for
taxation.'   From this it is argued that the Legislature in-
tended that *franchise* should be assessed for taxation only
once in four years, like real estate, and therefore should not
be assessed until 1903.   The fallacy of this argument lies in
the fact that Section 48 of the act of 1901, and Section 43
of the act of 1899, are both, by their express terms, limited to
the *tangible or physical* property of the railroads, and do not
pretend to relate to the assessment of the franchise."

If I understand the above-quoted paragraph, it is a virtual
admission that *"tangible or physical* property is not to be
*assessed for taxation until 1903.*   To my mind, it is suscepti-
ble of no other construction.   It admits that the statute of
1899 has been changed from *"the first day of June of each
year,"* to read as follows, *"at such date as real estate is re-
quired to be assessed for taxation."*   And it is not denied
that Section 12 of the act of 1901, *fixes that time in 1903.*
But it is argued that this change only applies to "tangible or
physical property, as the word *franchise* is not mentioned in
either Section 43 of the act of 1899, nor in Section 48 of the
act of 1901.   This argument, if true, would make the "tangi-
ble or physical" property of the railroads—that is, everything
they owned—except *franchises,* assessed for taxation in 1903,
and every four years thereafter, but that *franchises* must be

*assessed for taxation every year.* If that proposition can be maintained, I admit that I have neither the power to comprehend language nor to construe the same.

It is not denied that Section 50 of the act of 1901 (as did Section 45 of the act of 1899) provides for making reports to the Commissioners. These reports are to enable them to make the reports they are required to make to the Governor and the County Commissioners, and not for the purpose of *assessments for taxation, as it is stated to be in Section 43, act of 1899, and Section 48 of the act of 1901.*

The property and franchises of the railroads are taxed under the act of 1899, Section 45, as is admitted in the opinion of the 'Court, and this assessment is continued to 1903, and reports of such taxes have to be made to the Governor and the Board of County Commissioners, that they may levy the county taxes. These are the purposes for which the reports mentioned in Section 49 and Section 50 are to be made to the Corporation Commission.

In my opinion, the judgment appealed from should be affirmed. Justice Cook concurs in this dissenting opinion.

This was written as a dissenting opinion to the opinion of Justice DOUGLAS, which was written as the opinion of the Court. It expresses my views of the case, and is now filed as a concurring opinion to the opinion of Justice MONTGOMERY, I concur in the conclusion at which he arrives, that there was "no error in the action of the Judge in dismissing the action." Justice COOK now concurs in this as a concurring opinion.

DOUGLAS, J., dissenting. This is an action for mandamus, heard upon the verified complaint and answer, to the latter of which is attached the message of Governor Aycock. These papers are as follows:

"The plaintiff complains of the defendant, and alleges:

"1. That Franklin McNeill, Samuel L. Rogers and D. H. Abbott are the duly constituted members of the North Carolina Corporation Commission, and are and have been since 1899 exercising the duties of said office.

"2. That by virtue of Section 47, Chapter 7, of the Public Laws of 1901, the said North Carolina Corporation Commission is constituted a Board of Appraisers and Assessors for railroad, telegraph, telephone, street railway, canal and steamboat companies, and other companies exercising the right of eminent domain, and is required by law to assess the property of said companies for taxation.

"3. That the defendants, as members of the said North Carolina Corporation Commission, have failed and refused to assess for taxation and determine the value of the intangible property of the railroad companies in this State, to-wit, the franchises separately from the assessment of the tangible property, as they are directed to do by Sections 43 and 50 of Chapter 7, Public Laws of 1901, and have failed and refused to attempt to make such valuation and assessment; and have failed and refused to determine, or attempt to determine, the market value of the capital stock, certificates of indebtedness, bonds and other securities of said companies in their assessment of the properties of said companies.

"4. That he is informed and believes, and avers, that said Corporation Commission is in possession of reliable evidence to the effect that the market value of the capital stock, certificates, bonds and other securities of the railroad companies in this State is as much as one hundred and fifty millions of dollars. The value of the tangible or physical property of said companies is found by said Commission to be about forty-two millions of dollars—so that the assessment of the said franchises, as above set out, and as the law directs, would find the value thereof to be approximately one hundred and eight

millions of dollars, which it is the duty of said Commission to assess for taxation in this State in addition to their assessment of the said physical property.

"5. That the plaintiff is a citizen and taxpayer of this State, with his residence in the county of Washington, and is also Sheriff of said county, and is therefore interested in this action.

"6. That he has demanded of the said Franklin McNeill, Samuel L. Rogers and D. H. Abbott that they proceed to perform the duty set out in section three; that they still refuse to do so, without legal or just excuse.

"Wherefore, he prays that a peremptory writ issue from this Court to the said Commissioners, commanding them to proceed without delay to assess, and make due return thereof, the said franchises, and to so perform their official duties as above set out and as defined in Section 50, Chapter 7, Public Laws of 1901, and to perform such other and further duties as may be necessary to that end." (Duly verified.)

"The defendants, answering the complaint of the plaintiff, say:

"1. That paragraph one of the plaintiff's complaint is true.

"2. That paragraph two of the plaintiff's complaint is true.

"3. That the facts set forth in paragraph three of the plaintiff's complaint are not true, except that the defendants have not determined the value and assessed for taxation the intangible property of railroad companies in this State, to-wit, the franchise separately from the assessment of the tangible property. Defendants deny that it was made their duty so to do by Sections 43 and 50, Chapter 7, Public Laws of 1901, or any other law, as they are advised and believe.

"4. That paragraph four of the plaintiff's complaint is not true.

"5. That paragraph six of the plaintiff's complaint is true, as defendants are informed and believe.

"6. Answering paragraph six, the defendants admit that they received a letter purporting to be written by plaintiff, by H. S. Ward, attorney, which was dated August 31, 1901, and was received by defendants September 2, 1901, demanding that defendant assess the tangible and intangible property of railroads separately, but defendants deny that they refused to comply with such demand without legal or just excuse.

"Answering further, defendants allege, as they are advised and believe, that plaintiff has no right to make such demand.

"The defendants, further answering thec omplaint of the plaintiff, allege, as they are advised and believe, that they have discharged the duties required of them by law in the matter of the assessment of railroad property, and that on the 30th day of July, 1901, they certified to the Auditor of the State and to the Chairmen of the Boards of County Commissioners of the several counties in North Carolina interested therein, the assessment upon which State, county and town taxes should be computed; and that they are informed and believe that the railroad companies have paid their State taxes thereon, and that the county and school taxes have been computed in accordance therewith, and entered upon the tax duplicate of the said counties, and that said tax duplicates are now, or should be, in the hands of the Sheriff or Tax Collectors for collection.

"That these defendants did not make a separate assessment of the tangible and intangible property of the railroad companies for the year 1901 because, as hereinbefore alleged, they were advised and believed that the laws of North Carolina did not require them to do so.

"Further answering, the defendants allege that in the year 1899 they assessed the value of the railroad property, including franchises, as required by law, and that in the year 1900 they again assessed the value of the railroad property, including franchises, at the same value as in 1899; and, in accord-

ance with law, they adopted the assessment for 1900, which is the same as the assessment for 1899, for the year 1901, as they understood and construed the law to direct.

"That these defendants are advised and believe that the laws in force in the years 1899 and 1900, and for several years prior thereto, required an annual assessment of railroad property, but that the time for the making of said assessments, by the provisions of Section 48, Chapter 7, Laws of 1901, was postponed to 'such date as real estate is required to be assessed for taxation,' which time is fixed by said Chapter 7, Section 12, in the year 1903, and every fourth year thereafter; and the said defendants are further informed and believe that the said change in the time for the assessment of railroad property was made for the reason communicated to the General Assembly of 1901 by the message of His Excellency Governor Aycock, a copy of which is hereto attached, marked Exhibit 'A,' and made a part of this answer.

"Wherefore, the defendants pray judgment of the Court:

"1. That the plaintiff's prayer for a writ of mandamus be denied, and that his action be dismissed.

"2. For their costs in this behalf incurred, to be taxed by the Clerk of this Court."     (Duly verified.)

### EXHIBIT "A."

*"To the Honorable the General Assembly:*

"I transmit herewith the second annual report of the North Carolina Corporation Commission.   You will observe from said report that the cases known as the Railroad Taxation Cases, pending in the Circuit Court of the United States for the Eastern District of North Carolina, have been compromised and settled.   Under the provisions of law, the Corporation Commission, in 1899, assessed the property of the Atlantic Coast Line at $12,885,775, the Southern Railway at $14,713,850, and the Seaboard Air Line at $7,980,245—

making a total assessment of $35,579,870, which was a total increase on the three systems over the assessment of 1898 of $9,022,678. The assessment of three systems named in 1900 was $36,373,382. In a short time after these assessments were made, the three systems named secured an injunction from the Circuit Court of the United States for the Eastern District of North Carolina, restraining the collection of taxes on the assessment over and above the assessment of 1898. During the pendency of these suits much evidence was taken on both sides—that on the part of the railroads tending to show a considerable and systematic undervaluation of the other property of the State; and that on the part of the State, while showing undervaluation in many instances, tending to show that the undervaluation was erratic and not systematic.

"During the pendency of the investigation, and while evidence was being taken at Wilmington early in January of this year, I received a telegram from Hon. H. G. Connor, of counsel for the State of North Carolina, asking me to come to Wilmington. Upon my arrival in Wilmington, I found that propositions of settlement were being discussed between those representing the railroads and those representing the State. The railroads insisted upon a reduction of the assessment made in 1899, but were willing to pay on the assessment of 1900, provided their assessable property should not again be assessed until there was another assessment of other property in the State. Upon conference with Chairman McNeill, of the Corporation Commission, Hon. H. G. Connor and Col. J. W. Hinsdale, representing the State, we came to the conclusion that no abatement in the assessment for either the year 1899 or 1900 could, under any circumstances, be made. We, therefore, declined to assent to any reduction in the assessment for either year, but were willing that the property of the railroads subject to assessment should only

be assessed as often as other property in the State is or shall be assessed. Upon consideration, those representing the railroad companies decided to accept our view of the matter, and withdraw their suits, and pay the taxes assessed against them in accordance with the assessment made by the Corporation Commission both for the years 1899 and 1900, and they have paid into the State Treasury the full amount of taxes due the State, to-wit, $44,561, and are now ready to pay, as soon as the Clerk of the Corporation Commission can make out the necessary statements, $32,084 into the school fund, and $101,559 to the counties, cities and towns, aggregating $178,244.

"This settlement appears to me to be just, and I, therefore, recommend to the General Assembly to place the railroads as to the time of assessment of their property upon terms of equality with all other assessable property in the State. If such a law shall be passed, the railroads will not again be assessed until 1903.

"There are many good men, I am aware, who would have preferred to continue the litigation, and to pass other and more stringent tax laws against the railroads, but to do so involves continued litigation, which so far has cost the State $18,273.25, with a considerable sum still due for services already rendered, and which can not be continued at less than the cost of $20,000 per year to the State. The railroads constitute a considerable and valuable part of the property of North Carolina, and they are of great importance to its industrial development. No fair-minded man desires in any way to hamper their growth and development. On the other hand, no just man can assent to their having an advantage in taxation. They ought to bear the burdens of the State in proportion to their ability to meet them, but it is not a violation of this rule to act upon the assessment made by our Corporation Commission, who have conscientiously and

earnestly striven to do justice in the matter of taxation. In the settlement of a lawsuit, it never happens, so far as my experience and observation go, that either side is perfectly satisfied with the settlement; but it is frequently wiser to settle litigation than to continue it. I am persuaded that this is one instance in which it would be wise, both for the State and the railroads, to come to an agreement. It rests with the General Assembly to carry out or not the terms upon which the settlement has been made. The question is no longer for me, further than to say that, in my judgment, what has been done is both just and wise.

"CHARLES B. AYCOCK.

"By the Governor:

"P. M. PEARSALL,
*"Private Secretary."*

The following are the sections of Chapter 7 of the Public Laws of 1901 whose construction is essential to the determination of this action:

"SEC. 48.—*Railroads.*—The president, secretary, superintendent or other principal accounting officers within this State of every railroad, telegraph, telephone, street railway companies, whether incorporated by the laws of this State or not, shall, at such dates as real estate is required to be assessed for taxation, return to the said Commissioners for assessment and taxation, verified by the oath or affirmation of the officer making the return, all the following-described property belonging to such corporation within this State, viz., the number of miles of such railroad lines in each county in this State, and the total number of miles in the State, including the road-bed, right-of-way and superstructures thereon, main and side-tracks, depot buildings and depot grounds, section and tool-houses, rolling stock and personal property, necessary for the construction, repairs or successful operation

of such railroad lines, including also, if desired by the North Carolina Corporation Commission, Pullman or sleeping-cars owned by them or operated over their lines."

"SEC. 49.—*Railroads.*—The movable property belonging to a railroad company shall be denominated for the purpose of taxation, 'rolling stock.' Every person, company or corporation owning, constructing or operating a railroad in this State, shall (in the month of June, annually) return a list or schedule to the Commissioners, which shall contain a correct detailed inventory of all the rolling stock belonging to such company, and which shall distinctly set forth the number of locomotives of all classes, passenger cars of all classes, sleeping and dining-cars, express cars, horse cars, cattle cars, coal cars, platform cars, wrecking-cars, pay cars, hand cars, and all other kinds of cars, and the value thereof, and a statement of schedule as follows: (1) The amount of capital stock authorized and the number of shares into which such capital is divided; (2) The amount of capital stock paid up; (3) The market value, or, if no market value, then the actual value of shares of stock; (4) The length of line operated in each county, and total in the State; (5) The total assessed value of all the tangible property in the State; (6) And, if desired, all the information heretofore required to be annually reported by Section 1959 of The Code. Such schedule shall be made in conformity to such instructions and forms as may be prescribed by the Commissioners, and with reference to amounts and values, on the first day of June of the year for which the return is made."

"SEC. 50.—*Tangible and intangible property assessed separately.*—(a) The said Commissioners shall first determine the value of the tangible property of each division or branch of such railroad, or rolling stock, and all other physical and tangible property. This value shall be determined by a due consideration of the actual cost to replace the property, with

a just allowance for depreciation on rolling stock, and also of other conditions to be considered as in the case of private property.    (b) They shall then assess the value of the franchise, which shall be determined by due consideration of the gross earnings as compared with the operating expenses, and particularly by consideration of the value placed upon the whole property by the public (the value of the physical property being deducted), as evidenced by the market value of all capital stock, certificates of indebtedness, bonds or other securities, the value of which is based upon the earning capacity of the property.    (c) The aggregate value of the physical or tangible property and the franchise, as thus determined, shall be the true value of the property for the purpose of an *ad valorem* taxation, and shall be apportioned in the same proportion that the length of such road in each county bears to the entire length of such division or branch road in each county bears to the entire length of such division or branch thereof; and the Commissioners shall certify to the Chairmen of the County Commissioners and the Mayor of each city and incorporated town, the amount apportioned to his county, city or town, and the Commissioners shall make and forward a like certificate to the Auditor of the State.    All taxes due the State from any railroad company, except the tax imposed for school purposes, shall be paid by the treasurer of each company directly to the State Treasurer within thirty days after the first day of July of each year, and upon failure to pay the State Treasurer as aforesaid, he shall institute an action to enforce the same in the county of Wake, or any other county in which such railroad is located, adding thereto twenty-five per centum of the tax.    The Board of County Commissioners of each county through which said railroad passes shall assess against the same only the tax imposed by the State for school purposes and those imposed for county purposes."

"SEC. 51.—*Railroads.*—When any railroad has part of its road in this State, and part thereof in any other State, the Commissioners shall ascertain the value of railroad track, rolling stock, and all other property liable to assessment by the Corporation Commission of such company, as provided in the next preceding section, and divide it in the proportion to the length of such main line of road in this State bears to the whole length of such main line of road, and determine the value in this State accordingly."

The Court below denied the motion for a writ of mandamus and dismissed the action. Plaintiff appealed.

The above is the statement of facts on which the following opinion is based.

The vital question involved in this action is whether the railroad corporations in this State shall pay *any* tax upon their intangible property before the year 1903. The *form* of the question is whether, considering the legal relation between Sections 48, 49 and 50 of the Machinery Act of 1901, the assessment of the intangible property contemplated in Section 50 can be made before the next assessment of real estate belonging to private individuals. Of course, if the intangible property can not be assessed, the taxes thereupon imposed by law can neither be collected nor ascertained. We are aware of the great importance of this case to the railroads on the one hand, and on the other to the State and its citizens; and we would have preferred that the parties whose real interests are at stake should have been directly represented in this action. They would have been heard, had they seen fit to become parties hereto. However, we must decide the case as it is brought before us, and, as the questions have been clearly presented, we find no substantial difficulty in their determination. This is suggested to us by the contention of the defendant that this action can not be maintained by the plaintiff, but could have been brought only by some officer of the State upon whom is imposed the legal duty of enforcing

its laws and collecting its revenues. It is contended that the action, if proper, should have been brought by the Governor or the Attorney-General, or at least by leave of the latter; but the Governor has not brought any such action, while we find the Attorney-General appearing for the defendants. We do not mean to reflect upon these high officers in the slightest degree, and state these facts merely in answer to the contention of the defendants that they alone could act.

It is true this Court said in *Russell v. Ayer,* 120 N. C., 180, 185, 37 L. R. A., 180, "There can be no serious question concerning the power of the Governor to bring an action in the nature of this one"; but it does not say that he alone can bring it. On the contrary, it cites *Carr v. Coke,* 116 N.C., 223, 47 Am. St. Rep., 801, 28 L. R. A., 737, where the opinion of the Court opens with the following statement: "The plaintiff, *as a citizen and taxpayer of the State,* brings this action against the defendant, as Secretary of State, who, by virtue of his office, is the custodian of all acts passed by the Legislature, or which purport to have been passed, whose duty it is to deliver certified copies of said acts to the Public Printer for publication." It is true, in that case the mandamus was refused on constitutional grounds, but the right of the plaintiff to bring the action in his private capacity was not questioned. It does not appear that Elias Carr, "as a citizen and taxpayer," had any greater interest in the result of that action than the plaintiff has in that at bar.

At the threshold of this opinion we desire to eliminate whatever contingent interest the plaintiff may have in his commissions as Sheriff, and to place our decision upon the broad ground that every citizen has the right to demand that every other property holder shall pay his lawful taxes. This doctrine is, in our opinion, founded upon reason and authority, and is thoroughly consistent with the highest principles of public policy. In High's Ext. Leg. Rem., the learned au-

thor says, in Section 431: "When the question is one of public right, and the object of the mandamus is to procure the enforcement of a public duty, the people are regarded as the real party in interest, and the relator at whose instigation the proceedings are instituted need not show that he has any legal or special interest in the result, it being sufficient to show that he is a citizen, and as such interested in the execution of the laws." This doctrine is sustained by a decided preponderance of American authority, but among so many cases few can be cited. Among those peculiarly appropriate as relating directly to taxation are the following, selected from different States and running through a long period:

In *State v. Hamilton*, 5 Ind., 310, where a mandamus was granted compelling the County Auditor to return railroad property for taxation, the Court says, on page 319: "The objection has been made that this *mandamus* could not issue on the relation of John P. Dunn, Auditor of State. The assessment of the taxes for State purposes is a matter of public concern in which all the citizens of the State are interested; and hence, according to the case of *Hamilton v. The State*, in this Court, November Term, 1852 (3 Ind. Rep., 452), any citizen of the State might have been the relator. At the same time, it was peculiarly appropriate that the prosecution should be upon the relation of the Auditor of State, he being the officer more specifically charged with the management of the finances of the State."

In *People v. Halsey*, 37 N. Y., 344, 346, the Court says: "The writ of mandamus may, in a proper case, and in the absence of an adequate remedy by action, issue on the relation of a private individual, to redress a wrong personal to himself, or on the relation of one who, in common with all other citizens, is interested in having some act done of a general public nature, devolving as a duty upon a public officer or body who refuse to perform it. The collection of a tax, le-

gally assessed, in which all the inhabitants of any particular division of the State have a common interest, is an instance of this character, and such collection may be enforced by any one of such citizens." And again, on page 348: "Inasmuch as the people themselves are the plaintiffs in a proceeding by mandamus, it is not of vital importance who the relator should be, so long as he does not officiously intermeddle in a matter in which he has no concern. The office which a relator performs is merely the instituting a proceeding in the name of the people and for the general benefit. The rule, therefore, as it is sometimes stated, that a relator in a writ of mandamus must show an individual right to the thing asked, must be taken to apply to cases where an individual interest is alone involved, and not to cases where the interest is common to the whole community."

In *Ford v. Mayor,* 44 Ga., 213, 216, in an action brought by "Ford *et al.,* citizens, freeholders and taxpayers of the city of Cartersville," the Court held that "If the Mayor and Aldermen have illegally exempted the water-works company from taxation, and refuse to levy a tax upon the property of said corporation, the citizens can compel them to do so by writ of mandamus."

In *Hugg v. Camden,* 39 N. J. Law, 620, where the City Solicitor applied for a mandamus to compel the City Council of Camden to sell lands for taxes on the ground that he would be entitled to certain fees for selling such lands, the Court doubted whether such contingent interest would entitle him to the writ, but held that he could sue as a *taxpayer,* saying, on page 624: "But it is not necessary that he should show such interest as a public officer, to prosecute this writ. He is not a mere volunteer, interfering in a public or private matter. He has the right, as a citizen and taxpayer in the city of Camden, to be the relator in a mandamus when seeking the enforcement of a duty by the common Council of the

city, which is a public right, affecting the whole community, and also his interest as such taxpayer." On page 622, the Court also uses the following significant language, in reply to the contention that such sale was within the *discretion* of the Common Council: "But these words, 'It shall and may be lawful,' in this statute, are mandatory, not directory and discretionary. The power conferred by them must be exercised. It is the settled construction that where a public or municipal corporation, or body, is invested with powers to do an act which the public interests require to be done, and has the means for its complete performance placed at its disposal, not only the execution, but the proper execution, of the power may be insisted on as a duty, though the statute conferring it be only permissive in terms."

The case of *Railroad v. Hall,* 91 U. S., 343, while not relating to taxation, seems directly in point.

The last case we shall cite upon this point is the recent Illinois case of *State Board of Equalization v. People,* 191 Ill., 528, which, in the nature of the suit, the manner in which it was brought, and the results sought to be obtained, are almost identical with the one at bar. Quoting the opinion in that case: "This is a petition for a writ of mandamus, filed in the Circuit Court of Sangamon County by the State's attorney of said county, upon the relation of Catherine Goggin and Robert C. Steele, against the State Board of Equalization and the members thereof (naming them), to coerce said Board and the members thereof forthwith to value and assess, in the manner provided by law, the capital stock, including franchises, of each of the following named corporations." A large number of corporations were included, principally street railway companies, the aggregate value of whose intangible property over and above the assessed value of their tangible property was alleged to be two hundred and thirty-five millions of dollars. Neither the Attorney-General nor

any other State officer was a party. The relators were
school teachers, suing as taxpayers, and yet the mandamus
was granted. It is true, in that case the Court went further
than we have any reason to anticipate being compelled to go.
It declared the assessment made by the State Board of
Equalization to be so grossly inadequate as to be fraudulent
upon its face. We doubt not that the members of our Cor-
poration Commission will be glad of an authoritative declara-
tion of the law, and will follow our decision in letter and
spirit.

As the plaintiff has the legal capacity to maintain this ac-
tion, it remains to be considered to what relief he is entitled.

There seems to be no question as to the power of the Legis-
lature to impose the taxes in form and substance as contem-
plated in Section 50 of the Machinery Act of 1901. Section
3 of Article V of the Constitution of this State is as follows:
"Laws shall be passed taxing, by a uniform rule, all monies,
credits. investments in bonds, stocks, joint stock companies
or otherwise; and also, all real and personal property, ac-
cording to its true value in money. The General Assembly
may also tax trades, professions, franchises and incomes, pro-
vided that no income shall be taxed when the property from
which the income is derived is taxed." The power to tax
franchises, including the intangible property of a corpora-
tion, seems to be optional; but it is fully given, and does not
seem to be in conflict with the Federal Constitution. This
principle is ably and elaborately discussed in State Railroad
Tax Cases, 92 U. S., 575. The Court therein says, on page
602: "It is obvious, however, that while a fair assessment
under these two descriptions of property will include all the
visible and tangible property of the corporation, it may or
may not include all its wealth. There may be other property
of a class not visible or tangible which ought to respond to
taxation, and which the State has a right to subject to taxa-
tion." Again, the Court says, on page 605: "It is, there-

fore, obvious that when you have ascertained the current cash value of the whole funded debt, and the current cash value of the entire number of shares, you have, by the action of those who, above all others, can best estimate it, ascertained the true value of the road, all its property, its capital stock, and its franchises; for these are represented by the value of its bonded debt and of the shares of its capital stock." Later cases are to the same effect, generally citing this case. Kentucky R. R. Tax Cases, 115 U. S., 321, 339; *W. U. Tel. Co. v. Mass.,* 125 U. S., 530; *Ins. Co. v. N. Y.,* 134 U. S., 594; *Car Co. v. Penn.,* 141 U. S., 18; *Mass. v. Tel. Co.,* 141 U. S., 40; *Col. So. Ry. v. Wright,* 151 U. S., 470; *Ry. Co. v. Backus,* 154 U. S., 421; *R. Co. v. Cal.,* 162 U. S., 91; *So. P. R. Co. v. Cal.,* 162 U. S., 167. These cases sustain not only the fairness and legality of the method of assessment prescribed by our statute and approved in State Railroad Tax Cases, *supra,* but also the further principle that (quoting headnote in *Ry. v. Backus*) "when a railroad runs into or through two or more States, its value for taxation purposes, in each, is fairly estimated by taxing that part of the value of the entire road which is measured by the proportion of the length of the particular part in that State to that of the whole road."

The capacity of the plaintiff to sue, and the power of the Legislature to impose the tax having been determined, it remains for us to ascertain the intention of the Legislature as expressed in the act. That the Legislature intended to assess and collect *at some time* the taxes referred to in Section 50 does not admit of question. To that extent the act is clear and explicit, neither requiring nor permitting interpretation. The only point susceptible of doubt is as to the *time* when such assessment should be made. This point, we must confess, gave us some trouble. And yet, if we give effect to all parts of the act, we can come to but one conclusion. It

seems clear to us that the General Assembly intended Sections 49 and 50 of the act in question to go into immediate operation. If otherwise, why should they have been put into the act at all? We must take judicial notice that under our Constitution and laws, another Legislature will be elected and in session before the month of June, 1903. It is common knowledge, appearing from our public statutes and legislative Journals, that each Legislature passes its own Revenue and Machinery Acts, which are intended to be, and usually are, complete in themselves. It can scarcely be presumed that the Legislature of 1901 deliberately did so vain a thing as either to attempt to bind that of 1903 by anticipatory legislation on the one hand, or, on the other, to pass an act which it did not intend to be operative. Moreover, it is obvious that the assessment required by Section 50 is to be based upon the statements prescribed in Section 49, and yet those statements are, by the very terms of said section, to be made "in the month of June *annually.*" Why should they be made annually if they are to be acted upon only quadrennially? Why have four separate and distinct sets of annual statements when only one can be of any possible use? These statements must necessarily vary, as does the value of all personal property, as times are good or bad. The value of railroad property especially is peculiarly susceptible to the changes produced by the contraction and expansion of the general business of the country. Therefore, what might be a fair valuation for one year might be grossly excessive or inadequate for the remaining three years. Real property is not subject to such sudden and violent fluctuations, or at least to a far less degree. Hence, it is the long-established rule in this State to assess the real property of individuals only once in every four years, while their personal property is assessed annually. The value of intangible property is much more liable to fluctuation than even tangible personal property,

and hence the greater propriety of an annual assessment.
These reasons, with none apparently to the contrary, force us
to the conclusion that the act intended that Sections 49 and
50 should apply to the assessment of 1901, and annually
thereafter.

Great stress is laid upon the fact that Section 48 of the
act of 1901, which is substantially a re-enactment of Section
43 of the act of 1899, changes the latter section by omitting
the words, "on the first day of June of each year," and in-
serting the words, "at such dates as real estate is required to
be assessed for taxation." From this it is argued that the
Legislature intended that the *franchise* should be assessed for
taxation only once in four years, like real estate, and there-
fore should not be assessed until 1903. The fallacy of this
argument lies in the fact that Section 48 of the act of 1901,
and Section 43 of the act of 1899, are both, by their express
terms, limited to the *tangible or physical* property of the
railroads, and do not pretend to relate to the assessment of the
franchise. Section 48 says: "The president * * * shall,
*at such dates as real estate is required to be assessed for tax-
ation,* return to the said Commissioners, *for assessment and
taxation,* verified by the oath or affirmation of the officer mak-
ing the return, all the *following described property* belonging
to such corporation within this State, viz." [Then follows a
specific description of the different kinds of *physical or tan-
gible* property, without the slightest allusion to the franchises
or intangible property. *Inclusio unius est exclusio alterius.*]

If the Legislature had intended Section 48 to apply to
franchises, it could very easily have said so. In fact, it
would have been easier to have said "all property, both tangi-
ble and intangible, including franchises," than to have said,
as it does say, "all *the following-described property,*" followed
by a long list of specific kinds of *tangible* property alone. The
fact that neither Section 48, nor its prototypes, has ever allu-

ded to the assessment of the *franchise,* which has always been regulated by other sections, seems conclusive. Those sections, both in the act of 1901 and that of 1899, which refer to the *franchises,* all provide for *annual* returns.

But one question remains: Does the act, exclusive of Section 48, provide sufficient machinery for annual assessments of the intangible property of railroad corporations. We think it does. Section 49 expressly provides that all railroad companies shall report annually to the Corporation Commission "(5) The total assessed value of all the tangible property in the State." This obviously refers to the present assessment of the tangible property that has already been made. We can not suppose that the Legislature intended to say that the railroad companies should report in the years 1901 and 1902 an assessment that would not be made until 1903. The gift of prophecy is not of legislative origin. Moreover, Section 49 also provides that railroad companies shall, if required by the Corporation Commission, furnish *annually,* in the month of June, all the information set out in Section 1959 of The Code. This latter section contains fifty different questions, completely covering in detail the total cost of the road and equipment, with its characteristics, transactions, cost of maintenance, operation and repair, the amount of capital stock permitted, subscribed and paid in, and total floating and funded debt, with average rate of interest. We see no reason why these three sections, 49 and 50 of the Machinery Act of 1901 and Section 1959 of The Code, taken together, can not be enforced without reference to Section 48 of said act.

It is not alleged that there is any repugnance in the sections of said act, but rather that their interdependence is so great as to forbid any separation. As they relate to different subjects of taxation, to-wit, tangible and intangible property,

and are shown to be capable of independent execution, we can not concur in the objection.

It should be borne in mind that the sections under consideration do not impose any additional tax upon railroads, as Section 45 of the Machinery Act of 1899 expressly directs that the value of the franchise shall be included in the assessment of railroad property. A comparison of Sections 49, 50 and 51 of the Machinery Act of 1901 with Sections 44, 45 and 46 of the act of 1899, will show that the only changes relate to certain details in the *method* of assessment. The principal change made by the act of 1901 (aside from Section 48) was the insertion of the following provision: "And particularly by consideration of the value placed upon the whole property by the public (the value of the physical property being deducted), as evidenced by the market value of all capital stock, certificates of indebtedness, bonds or any other securities, the value of which is based upon the earning capacity of the property." This is simply the rule so repeatedly approved by the Supreme Court of the United States, as shown above, and was evidently suggested to the Legislature by the great disparity between the assessed value of railroad property and its real value as shown by the market value of the stocks and securities based thereon.

It is suggested in behalf of defendants that the Legislature, by the provisions of Section 48, intended that the franchise or intangible property should not be taxed until 1903. That would be a very long and circuitous way of saying what might have been said in a few plain and explicit words. As the tax had already been imposed by existing law, such an interpretation would be, in legal effect, an *exemption* from taxation for the years 1901 and 1902. Can we suppose that the Legislature intended to create a practical exemption from taxation of valuable property under the guise of a mere change in the method of its assessment? We think not.

It is a well-settled rule of interpretation, here and else-where, that there can be no exemption unless the deliberate purpose of the State to create such exemption is declared in words too plain and explicit to require construction. The mere existence of a doubt is its legal determination in behalf of the State. This question is fully discussed in *Railroad v. Allsbrook,* 110 N. C., 137, which expresses the settled rule of this Court. In affirming that case, on writ of error, the Supreme Court of the United States says (146 U. S., 279, 301) : "We concur with the State Court in the conclusions reached, as sustained by reason and authority." A few quotations from the numerous decisions of that Court, run-ning through a long series of years, show how firmly the rule is established.

In *Bank v. Billings,* 4 Peters, 514, 561, Chief Justice Marshall, speaking for the Court, says: "That the taxing power is of vital importance; that it is essential to the exist-ence of government; are truths which it can not be necessary to reaffirm. They are acknowledged and asserted by all. It would seem that the relinquishment of such a power is never to be assumed. We will not say that a State may not relin-quish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole com-munity is interested in retaining it undiminished, that com-munity has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear."

In *Railroad Co. v. Maryland,* 10 How., 376, 393, Chief Justice Taney, speaking for the Court, says: "And certainly there is no reason why the property of a corporation should be presumed to be exempted, or should not bear its share of the necessary public burdens, as well as the property of indi-viduals. This Court, on several occasions, has held that the taxing power of a State is never presumed to be relinquished,

unless the intention to relinquish is declared in clear and unambiguous terms."

In *Bailey v. Maguire,* 89 U. S., 214, 226, 227, the Court says: "It is manifest the legislation which it is claimed relieves any species of property from its due proportion of the general burdens of government, should be so clear that there can be neither reasonable doubt nor controversy about its terms. The power to tax rests upon necessity, and is inherent in every sovereignty, and there can be no presumption in favor of its relinquishment. While it were better for the interest of the community that this power should on no occasion be surrendered, this Court has always held that the Legislature of a State, unrestrained by constitutional limitation, has full control over the subject, and can make a contract with a corporation to exempt its property from taxation, either in perpetuity or for a limited period of time. If, however, on any fair construction of the legislation, there is a reasonable doubt whether the contract is made out, this doubt must be solved in favor of the State. In other words, the language used must be of such a character as, fairly interpreted, leaves no room for controversy. * * * It is never for the interest of the State to surrender the power of taxation, and an intention to do so will not be imputed to it unless the language employed leaves no other alternative."

In *Railroad Co. v. Commissioners,* 112 U. S., 609, 617, the Court says: "This salutary rule of interpretation is founded upon an obvious public policy, which regards such exemptions as in derogation of the sovereign authority and of common right, and, therefore, not to be extended beyond the exact and express requirement of the grants construed *strictissimi juris.*"

In *Railroad v. Guffey,* 120 U. S., 569, 575, the Court says: "For it is the settled doctrine of this Court that an immunity from taxation by the State will not be recognized unless granted in terms too plain to be mistaken."

In *Wilmington and Weldon R. Co. v. Allsbrook*, 146 U. S., 279, 294, Chief Justice Fuller, speaking for the Court, says: "The taxing power is essential to the existence of government, and can not be held to have been relinquished in any instance unless the deliberate purpose of the State to that effect clearly appears. The surrender of a power so vital can not be left to inference or conceded in the presence of doubt, and when the language used admits of reasonable contention, the conclusion is inevitable in favor of the reservation of the power."

It is earnestly contended by the able counsel for the defendants that we should construe the statute in the light of the Governor's message, presuming that the Legislature intended to carry fully into effect the recommendations contained therein. We approach this question with much hesitation, because we gravely doubt the propriety of considering any outside matter when an act, viewed in all its parts, is on its face capable of intelligent construction. Black on Interpretation of Laws, Sec. 25; Endlich on Int. of Statutes, Secs. 2, 4, 8; Sutherland on Stat. Const., Sec. 237; Potter's Dwarris on Stat., page 193.

In *Sturges v. Crowninshield*, 4 Wheat., 122, 202, the Court says: "Although the spirit of an instrument, especially of the Constitution, is to be respected not less than its letter, yet the spirit is to be collected chiefly from its words. It would be dangerous in the extreme to infer from extrinsic circumstances that a case from which the words of the instrument expressly provided shall be exempted from its operation."

In *Alexander v. Worthington*, 5 Md., 485, the Court has lucidly expressed the rule applicable to the present discussion in the following words: "The language of a statute is its most natural expositor; and where its language is susceptible of a sensible interpretation, it is not to be controlled by any extraneous considerations. The construction is to be on the

entire statute; and where one part is susceptible indifferently of two constructions, and the language of another part is clear and definite, and is consistent with one of the two constructions of which the former part of the statute is susceptible, and is opposed to the other construction, then we are to adopt that construction which will render all clauses of the statute harmonious, rather than that other construction which will make one part contradictory to another."

However, as the message is made a part of the answer and is embodied in the case on appeal, we will give it that courteous consideration due to the supreme executive power of the State.     Much stress is laid by the defendants upon the expression that, "If such a law shall be passed, the railroads will not be again assessed until 1903."     But to ascertain the true meaning of the message, we must construe it as a whole, and not in its disjointed sentences.     This sentence is immediately preceded by the following statement: "This settlement appears to me to be just, and I therefore recommend to the General Assembly to place the railroads, as to the time of assessment of their property, *upon terms of equality with all other assessable property in the State."*     This can be done only by assessing the property of a railroad in the same manner as that of the citizen.     His real property is assessed quadrennially, while his personal property is assessed annually.     Intangible property is surely personal property.     We are not aware of any principle under which it could be classified as real estate.     If, therefore, we give any effect to the declared purpose of the message to place the railroads and the citizens of the State upon an equality in bearing the just burdens of taxation, we must conclude it to mean that the railroads will not be again assessed until 1903 on their real property.     Keeping in view the just equality of taxation, this construction becomes the more important, as any other would result in the practical exemption of railroad franchises from all taxation until 1903.

Again, it is urged that the faith of the State is pledged to the maintenance of the compromise entered into by the Governor and the General Assembly with the railroad companies. What were the terms of such compromise, if there was any compromise? The act makes no allusion to any compromise, nor is it alleged that any compromise is shown by the records of the Federal Court. The message thus alludes to the transaction: "The railroads insisted upon a reduction of the assessment made in 1899, but were willing to pay on the assessment of 1900, provided their assessable property should not again be assessed until there was another assessment of other property in the State."    *    *    *

"We therefore declined to assent to any reduction in the assessment for either year, but were willing that the property of the railroads subject to assessment should only be *assessed as often as other property in the State is or shall be assessed.* Upon consideration, those representing the railroad companies decided to accept our view of the matter and withdraw their suits," etc.

Giving to these words their fullest legitimate meaning, there is no allusion to any *exemption* from taxation such as would result from the construction we are asked by the defendants to place upon this act. In fact, such a construction would destroy all idea of a compromise. It appears from the message that the entire amount involved in the litigation in the Federal Court was an increased assessment of a little over nine millions of dollars; while it is evident from the report of the Corporation Commission, compared with the reports of current market values, that the value of the intangible property of the three railroad corporations which were parties to said litigation, after deducting the assessed value of their tangible property, was many times the amount involved. The essential nature of a compromise supposes mutual concessions, and can not be applied to an inconceivable transac-

tion wherein one party is supposed to bind himself to give up a sum largely in excess of that in litigation simply to settle a lawsuit. We do not think the message of the Governor, even if it could affect our interpretation of the statute, can, upon its face, justly require any such construction.

We see no merit in the contention that the defendants are *functi officio,* either individually or as a Commission. The Corporation Commission appears to be a continuing body, and, in fact, there has been no change in its personnel since the passage of the act. We see no constitutional objection to the method of assessment, as the corporations affected thereby will have the fullest opportunities to be heard. Indeed, it appears that the assessments will be based upon reports furnished by themselves. How far such reports will be binding upon the Commission is not before us; but we doubt not that the Commission will give to such companies a full and fair hearing before taking any final action affecting their interests.

The writ of mandamus will issue in accordance with the prayer of the complaint, requiring the defendants to proceed forthwith, under the provisions of Chapter 7 of the Public Laws of 1901, as construed in this opinion, to assess the intangible property of all persons or corporations referred to in Sections 49 and 50 of said act for the year 1901.

The above opinion, written more than a month ago under different circumstances and for a different purpose, is now filed as my dissenting opinion, embodying the views I still entertain as to the law. This I say in justice to myself, as my opinion, professedly dissenting from the opinion of the Court, does not allude thereto. As I have just received the opinion of the Court, it is impossible for me, in the few remaining hours of the session, to re-write my opinion, or even to materially change it without endangering its logical connection. In specifically dissenting from the opinion of the

Court, I scarcely know where to begin, as I dissent from it *in toto,* both in its conclusion and the reasoning by which it is reached.    There is one part, containing the dominating principle of the opinion, which I can not ignore.    It is the following: "If it should be objected to this opinion that to be consistent it embraces impliedly the view that there is no statute which fixes the assessment of the real and personal property of the railroad companies in this State upon which taxes can be levied and collected, until the assessment provided for in June, 1903, by the act of 1901, Chapter 7, Section 12, it would have to be admitted that that is a fact."    This is simply saying in substance that no species of railroad property, real or personal, tangible or intangible, can be assessed for taxes until June, 1903.    In this view I could never concur, as it would drive me to one of two inevitable conclusions, either that the Legislature intended to grant to the railroads a total exemption from all taxation for the years 1901 and 1902, or that the act is so utterly insensible as to be incapable of any reasonable interpretation.    If this be the opinion of the Court, I must again enter my respectful but most earnest dissent.

If, however, the able opinion of the Chief Justice, which, I understand, receives the concurrence of Justice COOK, holds, as it seems to me it does hold, that the railroads are liable for the years 1901 and 1902, at least to the amount of their assessment of 1900, then to that extent I concur in the concurring opinion.    This would eliminate from the opinion of the Court its vital principle, leaving practically only its conclusion concurred in by a majority of its members.    Hence, it seems needless for me to go into any further discussion beyond what is contained in the body of my opinion, from which the elaborate opinion of the Chief Justice was written in dissent.

CLARK, J., concurs in the dissenting opinion of DOUG-LAS, J.