T. C. WAGSTAFF v. CENTRAL HIGHWAY COMMISSION OF PERSON COUNTY.

(Filed 23 April, 1919.)

1. **Statutes—Amendments—Constitutional Law—Bond Issues—Taxation— Counties.**

Where the constitutional requirement that an act providing for the creation of a county debt and the levy of a tax, etc., shall be passed upon its various readings on separate days, with the "aye" and "no" vote taken, has been complied with by the Legislature, an amendment, which had not met this requirement but which does not increase the amount of the debt or the taxes to be levied or otherwise materially change the original bill, is also valid and constitutes a portion of the law without the observance of these formalities.

2. **Same—Highways—Public Roads.**

Where an act submitting the question of bonds for the construction and maintenance of the public highways of a county to the qualified voters therein has been passed on the several days with "aye" and "no" vote taken, as required by the Constitution, Art. II, sec. 14, stating that the highway commissioners of the county shall retire the bonds at certain intervals within a period of forty years, but expressly leaving this discretionary with them within the forty years, and subsequently, but before the issuance of the bonds, the act was amended by the Legislature

without observing these provisions of the Constitution, making the interest on the bonds payable semi-annually instead of on 1 July and January of each year, and leaving it absolutely discretionary with the said commissioners to determine the maturity of the bonds in series within the forty years: *Held*, the amendment did not change the material portions of the original bill, which met the constitutional requirements, and the amendment should be incorporated therein as a valid law.

3. **Constitutional Law — Equation — Poll Tax — Property Tax—Statutes—Special Tax—Highways—Public Roads.**

The equation between the property and poll tax fixed by section 1, Article V of our Constitution, refers to the ordinary general tax for state and county purposes, and has no application to a special act of the Legislature passed in conformity with Article II, section 14 thereof, submitting the question of bonds and taxation to the qualified voters of the county for the special purpose of constructing and maintaining its public roads.

CLARK, C. J., concurs in part.

CONTROVERSY without action, heard before *Lyon, J.,* holding courts of Tenth Judicial District, Spring Term, 1919, of PERSON.

The controversy is to determine the right of the defendant, the Central Highway Commission, to issue bonds of the county of Person for the construction and maintenance of the public highways therein, pursuant to chapter 74, Public-Local Laws 1919, as amended by the Laws of 1919, and to the issuance of an injunction to restrain the said proposed bond issue.

There was judgment for defendant, and plaintiff excepted and appealed.

*C. A. Hall* for plaintiff.
*F. O. Carver* for defendant.

HOKE, J.   Chapter 74, Public-Local Laws 1917, establishes a general scheme for the construction and maintenance of the public roads of Person County, creates a Central Highway Commission with power to supervise and control the matter, authorizes a bond issue, not to exceed $300,000, on approval of a majority of the votes cast at an election to be held for the purposes, and the laying of a tax, not to exceed 50 cents on the hundred dollars valuation of property and one hundred and fifty on the poll, to meet the interest and provide a sinking fund, the latter not to exceed 1 per cent on the entire issue; and the commission is authorized, in its discretion, to use any of the sinking fund for the purchase in open market of any of the bonds issued under the act, which said bonds are to run for a period not exceeding forty years from the date of issue.   An election having been held and the bond issue approved

by the voters, the act, in reference to the form of the bonds and the times when the same might be made to mature and when the current interest thereon paid, provides as follows: "The bonds so issued shall bear interest at the rate of not to exceed 5 per cent, payable the first day of July and January of each year, and shall run for a period not exceeding forty years from date of issue. The said Central Highway Commission may provide for the retirement of seventy-five thousand dollars of said bonds at the end of ten years after date of issue, seventy-five thousand dollars at the end of twenty years, seventy-five thousand dollars at the end of thirty years, and the other seventy-five thousand dollars at the end of forty years, all of this to be in the discretion of the Central Highway Commission."

This statute was regularly passed, pursuant to Article II, section 14 of the State Constitution, which requires that, in order to the validity of a law of this kind, "The bill shall be read three several times in each house of the General Assembly and passed three several readings, which readings shall have been on three different days and agreed to by each house respectively, and unless the yeas and nays on the second and third readings of the bill shall have been entered on the Journal." Before any bonds issued the General Assembly of 1919 amended this portion of section 2 of the original law, the amendment being in terms as follows:

"The General Assembly do enact: That section two of chapter seventy-four of Public-Local Laws of one thousand nine hundred and seventeen be and the same is hereby amended by striking out the words 'the first day of January and July of each year,' in line thirty thereof, and inserting in lieu thereof the word 'semi-annually.' And by striking out all of said section after the word 'issue,' in line thirty-one thereof, and inserting in lieu thereof the following: 'The said bonds may be made to mature in series at such time or times as the Central Highway Commission may in its discretion determine, it being the intent of this act to confer upon said Central Highway Commission full power and discretion to provide for the retirement of said bonds so sold by it in such amounts and at such time or times as it may prescribe within forty years from the date of the issue.'" That, under the powers conferred by these statutes and approved in the election, as stated, the Central Highway Commission of Person County proposes to issue and sell the coupon bonds of the county, to the amount of $225,000, bearing interest at the statutory rate and to mature as follows:

$15,000 maturing in  5 years from date of issue
$20,000 maturing in 10 years from date of issue
$25,000 maturing in 15 years from date of issue
$35,000 maturing in 20 years from date of issue

WAGSTAFF *v.* HIGHWAY COMMISSION.

$45,000 maturing in 25 years from date of issue
$55,000 maturing in 30 years from date of issue
$30,000 maturing in 33 years from date of issue

That the amendment to said act was not passed pursuant to Article II, section 14, and the question presented is as to the validity of the proposed issue. In various decisions of the court, construing this section of the Constitution, it has been held that when the original act, providing for the creation of a debt and the levy of a tax, etc., has been passed, pursuant to the constitutional requirements, that an amendment thereto, which does not increase the amount of the debt or the taxes to be levied or otherwise materially change the original bill, will be valid and constitute a portion of the law without the observance of the formalities referred to. *Gregg v. Comrs.,* 162 N. C., p. 479; *Comrs. v. Stafford,* 138 N. C., p. 453; *Brown v. Stewart,* 134 N. C., p. 357; *Glenn v. Wray,* 126 N. C., p. 730. Considering the record, in view of these decisions and others of like kind, we do not hesitate to hold that the amendment, the subject-matter of this controversy, makes no material change in the original statute and that the bond issue referred to will be in all respects valid.

It would not be seriously contended, in reference to the payment of the interest, that the change, making same due semi-annually instead of the first of July and January of each year, has any appreciable significance, and as to the tentative scheme submitted for the maturing of the bonds in successive periods of five, ten, fifteen years, etc., the time limit of forty years for the bond issue, contained both in the original act and the amendment, has not been passed. Neither the amount of the debt nor the rate of taxation has been exceeded. As stated in the well-considered argument of defendant's counsel, the sinking fund provision, limited to 1 per cent on the entire issue, would be more available and effective by reason of proposed method, and the burden on the taxpayer would seem to be made lighter rather than increased; but, apart from this, and we prefer to rest our decision on this ground, we are clearly of opinion that both in the original act and in the amendment the time for maturing and retirement of these bonds was left in the discretion of the Central Highway Commission, subject to the limitation that the issue should, in no event, exceed the period of forty years from the date of issue. On the question directly presented, while the original act, more by way of suggestion than requirement, provides that the commission may retire $75,000 of bonds at the end of ten years, $75,000 at the end of twenty, etc., and while the term "may" is usually construed as "shall" when a public duty is imposed upon a public official, *Jones v. Comrs.,* 137 N. C., p. 579, the portion of the law in question here closes with the very significant and, to our minds, controlling

provision that "All of this to be in the discretion of the Central Highway Commission." And the amendment, in striking out this part of section 2 and substituting for it the provision leaving the matter in the power and discretion of the commission, had no sensible effect upon the original statute. The amendment was no. doubt enacted to put at rest some question that had been raised concerning it and, in our opinion, made no appreciable change from the original law.

This disposes of the only exception appearing in the record. In regard to the effect of section 1, Article V of our Constitution, on the issue presented, that which establishes a limit of taxation on the poll and property and a fixed equation between them, as the question has been otherwise mooted, we consider it well to say that under authoritative construction dealing directly with the subject this section of the Constitution refers to the ordinary general taxation for state and county purposes, and has no application to taxation of this kind, which is for a special purpose, entered on with the special approval of the General Assembly, and which, in this instance, has also the sanction and approval of the popular vote. *Moose v. Comrs.*, 172 N. C., 419.

There is no error in the judgment of his Honor, and the same is
Affirmed.


CLARK, C. J., concurs in the opinion and the result, except as to the validity of the levy of a poll tax for the purpose of issuing bonds for the construction of public roads.

The Constitution, Art. V, sec. 1, provides: "The State and county capitation tax combined shall *never* exceed $2 on the head," and Article V, section 2, provides: "The proceeds of the State and county capitation tax shall be applied to the purpose of education and the support of the poor, but in no one year shall more than 25 per cent thereof be appropriated to the latter purpose." The poll tax ($1.50) laid in this act is in excess of the $2 which is already levied in Person County, and is beyond the limit permitted by the Constitution, which not only gives the explicit pledge to laborers and men of small means that they should not be taxed for the mere privilege of breathing the air more than $2 per year, but that that sum should be applied to no other purposes than "education and the support of the poor."

These two sections cannot be stricken from the Constitution. They could not be made more explicit. The whole subject was thoroughly reviewed and this view sustained by the unanimous opinion of this Court by *Connor, J.,* in *R. R. v. Comrs.,* 148 N. C., 220, where the court said that the provision was "imperative and prohibits the levy of any tax upon the poll for any purpose in excess of that sum; and applies the poll tax to the purposes of education and the support of the poor, and

. . . . withdraws it for any other purpose," adding, 148 N. C., 245: "This question cannot again arise."

This opinion was repeated in *R. R. v. Comrs.*, 148 N. C., 248, also written by *Judge Connor*, and in *Perry v. Comrs.*, 148 N. C., 521, by *Hoke, J.*

In this view, the issuance of the bonds is valid, but so much of the act as levies a poll tax for this purpose should be disregarded. The holders of the bonds have the right to resort to the collection of the principal and interest thereof upon the property of the county, and by the other valid taxes, but whenever the aggregate poll tax in any county exceeds $2 the mandate to the sheriff should cease, and even within the $2 the poll tax can be applied only to the purposes of education and the poor, hence striking it out cannot affect the bondholder.

If there is any authority to be found in the Constitution for the courts to supervise and hold invalid an act of the Legislature in any case, this is clearly such instance. The equation between the tax on property and on the poll necessarily ceases, as is held in the cases above cited, when the poll tax reaches the constitutional limitation of $2, nor can it be levied for any other purpose than education and the support of the poor.

The Constitution at Halifax, in 1776, made no reference to the poll tax, and it has always been unknown in England except in the one instance where its imposition centuries ago caused the insurrection known as the "Watt Tyler Rebellion," in consequence of which it was promptly repealed and has never since been reenacted, though in that country, far more than in this, government has been by the classes and not by the people. At divers times up to 1698, in England, there was a so-called poll tax but graded according to amount of property of each taxpayer.

In the Revised Statutes of North Carolina in 1835 there was a poll tax of 20 cents which was levied also upon the slaves. In the Revised Code of 1854 the poll tax was 40 cents, and it was levied chiefly because slaves were not taxed according to value as property, and otherwise would escape taxation. There was no tax on personal property in this State till about 1850.

When the Constitution of 1868 was adopted a poll tax was authorized but it was strictly limited to $2, with the further pledge that it should be used solely for the purposes of education and the support of the poor. The equation between property and polls is only required when providing for the ordinary expenses of the State and county government, and therefore in many statutes, such as this, the levy of the poll tax has been omitted, even when the total would not exceed the $2. *Board of Education v. Comrs.*, 137 N. C., 310; *Jones v. Comrs.*, 107 N. C., 248.

Out of the forty-eight States less than half levy any poll tax at all, and in them it is mostly restricted to 50 cents or $1, and is applied to

education and the support of the poor. Hollander on Taxation. If the poll tax in this case of $1.50 is levied it will be largely collected out of men who have no wheels to pass over the roads, nor any real estate to be increased in value by their construction. If the poll tax should be omitted from the tax list this will conform the statute to the Constitution and will in no wise impair the validity or the value of the bonds to be issued under this act, for there is ample property in the prosperous and progressive county of Person out of which to pay the principal and interest on these bonds.

That the poll tax should be retained at all, and unrepealed here, when it has disappeared almost everywhere else, is an anomaly. But that it should be still levied (in violation of the pledge in the Constitution) in excess of $2, or applied to other purposes than education and support of the poor, especially since the unanimous ruling of the Court in the cases above cited and the assurance therein given that "this question cannot again arise," is proof how little weight and thought is given to the laborer and the men of small means in legislation.

It is true that the poll tax is levied on poor and rich alike. And that is the very objection to it, for the amount, which is of no consideration to the well-to-do, is oppressive to those poorer who must often take from the living of themselves and their families to pay the $7 or $8 which has often been exacted. There was no thought of these men and no one to speak for them when this poll tax provision was put into this statute.

It is no defense that formerly our roads were worked by conscription of labor, a system handed down from ruder times in England, the same system which under the name of "Corvées" aided most materially to bring about the Great Revolution in France. This has been abolished here not only because unjust, but because, with a deep sense of the injustice of it in those thus conscripted, the system proved to be inefficient. Our Constitution not only restricts the tax on the mere privilege of living to $2, and as some justification of such taxation requires the application of that solely to "education and the poor," but in the same spirit Article V, section 5, authorized the General Assembly to exempt from taxation "wearing apparel, household and kitchen furniture, the tools of farmers and mechanics, and other personal property to a value not exceeding $300." Those to whom this exemption would be an act of justice have never yet had sufficient influence to procure its enactment (till the act of 1919, to take effect in 1920, fifty-two years after the adoption of the constitutional authority), while the vast exemptions to corporations were kept in full force until invalidated as to railroads by the decision in *R. R. v. Alsbrook,* 110 N. C., 137. In *Jackson v.*

*Commission,* 130 N. C., 425, the railroads, however, were more successful in their contention.

WALKER, J., concurring: My views concerning the limitation and equation of taxation under Article V, section 1 of the Constitution, and the relation of sections 1 and 6 of the same article, were fully stated in *Moose v. Comrs.,* 172 N. C., 419, at p. 451, and *Collie v. Comrs.,* 145 N. C., 183, and need not be restated here. I have not changed my opinion in that respect, but the Court decided that under section 6, with the special approval of the General Assembly, a county might levy a tax for a special purpose without regard to the limitation as fixed by section 1 of Article V; and while I entertain now the same views as those set forth in *Moose v. Comrs., supra,* I defer to that decision, as it would be futile at this time not to do so, a majority of the Court, as now constituted, still adhering to the decision in *Moose v. Comrs., supra,* and for the reasons stated in the opinion of the Court as delivered by *Justice Allen* in that case. Therefore I concur in the result in this case. Except as heretofore stated, I concur fully in the opinion of the Court, and also in the reasoning upon the other questions involved. It may be that the question, as to the limit of taxation and the maximum of poll tax that can be levied, is not clearly and distinctly raised in this record, but I have referred to the *Moose* and *Collie* cases merely to exclude any inference that I had surrendered my views upon that question.